UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DWAYNE ANTHONY DUPREE,

                    Petitioner,                   Case No. 1:21-cv-611

v.                                         Honorable Robert J. Jonker

GREGORY SKIPPER,

                    Respondent.

_____/

## OPINION

    This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Dwayne Anthony Dupree is incarcerated with the Michigan Department of Corrections at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. On June 7, 2017, following an eight-day jury trial in the Wayne County Circuit Court, Petitioner was convicted of conspiracy to commit first-degree murder, in violation of Mich. Comp. Laws § 750.316, second-degree murder, in violation of Mich. Comp. Laws § 750.317, felon in possession of a firearm (felon-in-possession), in violation of Mich. Comp. Laws § 750.224f, interference with a criminal case, in violation of Mich. Comp. Laws § 750.122, and use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On June 23, 2017, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to prison terms of life without parole for conspiracy, 50 to 75 years for murder, 10 to 25 years for interference with a criminal case, and 5 to 20 years for felon-in-possession. The court also sentenced Petitioner to 2 years for felony-firearm.

On July 16, 2021, Petitioner filed his habeas corpus petition raising four grounds for relief,

as follows:

I.      The state court decision was contrary to, or involved an objectionably
        unreasonable application of clearly established federal law, and/or an
        objectionably unreasonable determination of the facts in light of the
        evidence presented in the trial court, when it denied that . . . Mr. Dupree's
        trial counsel denied Mr. Dupree his Sixth Amendment right to the effective
        assistance of counsel when he failed to investigate and call as an alibi
        witness Shallena Cummings, failed to impeach or otherwise present
        evidence that David Matlock wanted to kill Mr. Dupree, and failed to
        challenge the admissibility of the toolmarks/ballistic evidence pursuant to
        Daubert or to cross examine the prosecutor's toolmark/ballistic expert and
        failed to hire a defense expert in toolmarks/ballistics?

II.     The state court decision was contrary to, or involved an objectionably
        unreasonable application of clearly established federal law, and/or an
        objectionably unreasonable determination of the facts in light of the
        evidence presented in the trial court, when it denied that . . . the jury verdict
        went against the great weight of the evidence as there is no direct evidence
        that Mr. Dupree was at the scene when Mr. Waller was murdered and the
        two witnesses who claim that he was involved had their testimony heavily
        impeached?

III.    The state court decision was contrary to, or involved an objectionably
        unreasonable application of clearly established federal law, and/or an
        objectionably unreasonable determination of the facts in light of the
        evidence presented in the trial court, when it denied that . . . the prosecutor
        failed to present sufficient evidence to convict Mr. Dupree?

IV.     The state court decision was contrary to, or involved an objectionably
        unreasonable application of clearly established federal law, and/or an
        objectionably unreasonable determination of the facts in light of the
        evidence presented in the trial court, when it denied that . . . the trial court
        erred when it indic[a]ted in the judgment of sentence that Mr. Dupree's
        conspiracy to commit first degree murder conviction sentence was life
        without parole?

(Pet., ECF No. 1, PageID.4–13.) Respondent asserts that certain grounds are procedurally

defaulted and non-cognizable, and that all of Petitioner's grounds for relief lack merit. (ECF

No. 12.) For the following reasons, the Court concludes that Petitioner has failed to set forth a

meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I. Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> In 2010, David Matlock shot Darryl Waller, who survived. Matlock hid from law enforcement until he was arrested in December 2014. He was arrested with Michael Alexander (his nephew) and Calvin Watson after the police stopped Watson's vehicle. The police discovered Matlock's outstanding warrant for having previously shot Waller, and Matlock was fearful that he could be incarcerated for life. While in custody, Matlock convinced Alexander and Watson to kill Waller upon their imminent release. Watson got [Petitioner] to drive a vehicle. [Petitioner], Watson, and Alexander formulated a plan to lure Waller from his home and shoot him. After a trial run, Watson dropped out. [Petitioner], Alexander, and another man killed the 57-year-old Waller at his home. Matlock and Watson testified against [Petitioner], although Watson, who had already been sentenced pursuant to his plea bargain, changed his story at trial in an apparent attempt to exonerate [Petitioner].

*People v. Dupree*, No. 339627, 2019 WL 6248015, at *1 (Mich. Ct. App. Nov. 21, 2019).

Jury selection for Petitioner's trial began on May 22, 2017. (Trial Tr. I, ECF No. 11-9.) Over the course of eight days, the jury heard testimony from numerous witnesses. (Trial Tr. I, II, III, IV, V, VI, VII, & VIII, ECF Nos. 11-9, 11-10, 11-11, 11-12, 11-13, 11-14, 11-15, and 11-16.) After a little over one day of deliberation, the jury reached a guilty verdict on June 7, 2017. (Trial Tr. VIII, ECF No. 11-16, PageID.1543–1544.) Petitioner appeared before the trial court for sentencing on June 23, 2017. (ECF No. 11-17.)

Subsequently, Petitioner, through counsel, filed a motion for new trial and/or request for funds to hire an expert and/or request for a *Ginther*[1] hearing. (ECF No. 11-21, PageID.1857–1884.) In that motion, Petitioner contended that counsel rendered ineffective assistance by: (1) failing to investigate and call an alibi witness; (2) failing to impeach Matlock with Matlock's statements that he wanted to kill Petitioner; and (3) failing to challenge the admissibility of the tool mark testimony, request a *Daubert* hearing on the admissibility of such testing, cross-examine the took mark expert, and ask for funding for a defense tool mark expert. (*Id.*) The trial court held a *Ginther* hearing on August 3, 2018, at which Petitioner's trial counsel, alibi witness Shallena Cummings, and Petitioner himself testified. (ECF No. 11-20.) The trial court denied Petitioner's motion in a written opinion entered on August 21, 2018. (ECF No. 11-21, PageID.1838–1849.)

Petitioner, with the assistance of counsel, appealed his conviction and sentence to the Michigan Court of Appeals, raising the same four issues he raises in his habeas petition. The court of appeals affirmed Petitioner's convictions and sentences on November 21, 2019. *See Dupree*, 2019 WL 6248015, at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on June 30, 2020. *See People v. Dupree*, 944 N.W.2d 698 (Mich. 2020).

This § 2254 petition followed. In an opinion and order (ECF Nos. 8 and 9) entered on September 22, 2021, the Court indicated that Petitioner had gone beyond the issues he raised on direct appeal to present "additional positions." (ECF No. 8, PageID.86.) Primarily, Petitioner appeared to be raising a claimed violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Court noted that given Petitioner's inclusion of an unexhausted *Brady* violation, his petition was "mixed." (*Id.*, PageID.87.) The Court directed Petitioner to show cause, within 28 days, why he

---

[1] In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

4

would be entitled to a stay of federal habeas proceedings if he wished to pursue his unexhausted claims in the state courts by filing a motion for relief from judgment pursuant to Michigan Court Rule 6.500. (*Id.*, PageID.89.) The Court advised Petitioner that if he failed to meet the requirements for a stay or comply with the Court's order, the Court would "review only his exhausted claims." (*Id.*, PageID.90.) Alternatively, the Court noted, Petitioner could "file an amended petition setting forth only his exhausted claims." (*Id.*) Petitioner, however, did not respond and, therefore, did not avail himself of any of these opportunities.

## II.     Unexhausted Claim(s)

In an opinion and order (ECF Nos. 8 and 9) entered on September 22, 2021, the Court informed Petitioner that "[his] argument with respect to habeas ground III . . . reveal[ed] that he has gone beyond his appeal issues to present 'additional positions.'" (ECF No. 8, PageID.86.) The "additional position" appeared to be a claimed violation of *Brady v. Maryland*, 373 U.S. 83 (1963), because Petitioner asserted that the "prosecutor suppressed recordings of alleged telephone calls between Petitioner and Mr. Matlock." (*Id.*) Petitioner also claimed that the prosecutor's failure to provide this information, which was requested during discovery, deprived him of the right to present a defense. (*Id.*) Petitioner also raised these same "additional positions" as part of habeas ground II.

The Court advised Petitioner that an applicant has not exhausted his available state remedies if he has the right under state law to raise, by any available procedure, the question presented. (*Id.* (citing 28 U.S.C. § 2254(c).) A procedure was, and is, available for Petitioner to raise his *Brady* claim and any other unexhausted claims asserted in his § 2254 petition: a motion for relief from judgment under Michigan Court Rule 6.500.

The Court may not grant habeas relief on unexhausted claims. 28 U.S.C. § 2254(b)(1). Moreover, a petition that is "mixed"—meaning it includes exhausted and unexhausted claims—is

5

properly dismissed. *Rose v. Lundy*, 455 U.S. 509, 522 (1982).[2] Such a dismissal, however, might jeopardize the timeliness of exhausted claims. To avoid that result, the Sixth Circuit adopted a stay-and-abeyance procedure. *See Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002). The Supreme Court cautioned that the procedure should be made available only in limited circumstances. *Rhines v. Weber*, 544 U.S. 269, 277 (2007).

To permit Petitioner to pursue his unexhausted claims without jeopardizing the timeliness of this exhausted claims, the Court directed Petitioner to show cause, within 28 days, why he would be entitled to a stay of federal habeas proceedings. (ECF No. 8, PageID.89.) The Court advised Petitioner that if he failed to meet the requirements for a stay or comply with the Court's order, the Court would "review only his exhausted claims." (*Id.*, PageID.90.) Alternatively, the Court noted, Petitioner could "file an amended petition setting forth only his exhausted claims." (*Id.*) Petitioner, however, did not respond and, therefore, did not avail himself of any of these opportunities. Therefore, the Court will review only his exhausted claims.

The Court may not grant habeas relief on unexhausted claims. 28 U.S.C. § 2254(b)(1). Accordingly, Petitioner's unexhausted claims will be dismissed without prejudice. Petitioner may choose to exhaust his state court remedies at some later time. Petitioner is advised, however, that if and when he eventually exhausts his state court remedies with regard to those claims, he must satisfy the AEDPA's limitations; he will have to obtain permission from the United States Court

---

[2] *Rose v. Lundy* was decided before the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted. At the time, the only barrier to successive habeas petitions was the "abuse of the writ" doctrine. The *Rose* Court made clear that dismissing "mixed" petitions was necessary to facilitate the resolution of all federal habeas claims in one proceeding—"to present the federal court with a single habeas petition." *Rose*, 455 U.S. at 520. The AEDPA introduced a specific limitation on second or successive petitions. 28 U.S.C. § 2244(b). The AEDPA "second or successive" petition limitations also encourage presentation of all habeas issues in one petition.

of Appeals for the Sixth Circuit to file a second or successive habeas petition. 28 U.S.C.
§ 2244(b)(1).

### III. Procedural Default

Respondent argues that the Court's consideration of some of Petitioner's claims is barred
by the doctrine of procedural default. When a state law default prevents further consideration of a
federal issue by the state, the federal courts ordinarily are precluded from considering that issue
on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). To determine whether
a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether
(1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court
enforced the rule so as to bar the claim, and (3) the state procedural default is an "independent and
adequate" state ground properly foreclosing federal habeas review of the federal constitutional
claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). To determine whether a state
procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court
decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291–
92 (6th Cir. 2010).

Respondent contends that habeas grounds II (Petitioner's great weight of the evidence
argument) and IV (Petitioner's challenge to the "life without parole" sentence) are procedurally
defaulted. (ECF No. 12, PageID.2501.) The Supreme Court has held that federal courts are not
required to address a procedural-default issue before deciding against the petitioner on the merits.
*Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the
[other] question priority, for example, if it were easily resolvable against the habeas petitioner,
whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v.
MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as
a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16

7

(6th Cir. 2003) (citing *Lambrix* and *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997)). Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215–16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) ("[T]he procedural default raises more questions than the case on the merits. We will therefore assume without deciding that there was no procedural default by petitioner and decide the merits of the case."); *Watkins v. Lafler*, 517 F. App'x 488, 498 (6th Cir. 2013) ("[T]he district court specifically noted that it chose not to address these [procedural default] arguments and rather assumed that no procedural default existed because "the procedural default issue raises more questions than the case on the merits.'. . . Given the variety and complexity of the defaults involved . . . we do likewise."). Here, it is simpler to resolve Petitioner's habeas grounds on the merits. The Court, therefore, will forego the procedural default analysis with respect to Petitioner's great weight of the evidence argument raised in habeas ground II, as well as the sentencing claim raised in habeas ground IV.

## IV.   AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's

claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## V.    Discussion

### A.    Ground I—Ineffective Assistance of Counsel

As his first ground for relief, Petitioner contends that trial counsel rendered ineffective assistance in numerous ways. Specifically, Petitioner faults counsel for: (1) failing to investigate and call Shallena Cummings as an alibi witness; (2) failing to impeach or otherwise present evidence that Matlock wanted to kill Petitioner; and (3) failing to challenge the admissibility of the toolmarks/ballistic evidence, failing to cross-examine the prosecutor's toolmark/ballistic expert, and failing to hire a defense expert in toolmarks/ballistics. (Pet., ECF No. 1, PageID.4.)

#### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as

11

they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d), analysis of counsel's performance. In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance of counsel claims on direct appeal, and the court of appeals addressed them under the following standard:

> A defendant's right to the effective assistance of counsel is guaranteed by the United States and Michigan Constitutions, U.S. Const., Am VI; Const. 1963 art. 1, § 20. *People v. Cline*, 276 Mich. App. 634, 637; 741 N.W.2d 563 (2007). To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance was deficient, i.e., fell below an objective standard of reasonableness, and prejudiced the defense. *People v. Taylor*, 275 Mich. App. 177, 186; 737 N.W.2d 790 (2007); *People v. Jordan*, 275 Mich. App. 659, 667; 739 N.W.2d 706 (2007). The performance will be deemed to have prejudiced the

> defense if it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different." *Id.* The "effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v. Rodgers*, 248 Mich. App. 702, 714; 645 N.W.2d 294 (2001).

*Dupree*, 2019 WL 6248015, at *1. Although the court of appeals cited state court authority for the standard, the standard applied is identical to *Strickland*. Moreover, if one looks to *Cline*, the source of the standard is identified as *Strickland*. *See Cline*, 741 N.W.2d at 566. Thus, there is no question that the court of appeals applied the correct standard.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard Petitioner can only overcome the deference afforded state court decisions if the determinations regarding Petitioner's ineffective assistance claims are unreasonable applications of *Strickland* or if the state court's resolutions were based on unreasonable determinations of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider whether the court of appeals reasonably applied the standard for each of Petitioner's claims of ineffective assistance of counsel.

### 2.    Alibi Witness

Petitioner first faults trial counsel for failing to "investigate and call" Shallena Cummings as an alibi witness. (Pet., ECF No. 1, PageID.4.) The court of appeals rejected Petitioner's claim, stating:

> [Petitioner] first argues that his trial counsel failed to investigate or present to the jury testimony from an alibi witness, Shallena Cummings, whom [Petitioner] had suggested as a witness. At the *Ginther* hearing, [Petitioner] stated that he informed his trial counsel, Michael McCarthy, that he had been with Cummings (whom he only knew as "little momma") at the time of the crime, and that McCarthy responded that he should not tell anyone because of Cummings's age. Cummings testified that she shared a child with [Petitioner], and that she was at [Petitioner's] home from 10:00 a.m. to 7:00 p.m. on the date of the crime (January 1, 2015). However, she could not remember the location of the home. She stated that [Petitioner's] girlfriend was not home so she and [Petitioner] were babysitting and having sex, and that his girlfriend did not come home before she left. Cummings also reported that during the trial she twice phoned [Petitioner's] trial attorney, whose name she could not recall, on his cell phone, but she did not leave any message.
>
> McCarthy explained that [Petitioner] sent him a letter in December 2015 stating generally that he had alibis, and asking whether they could inform the court of the alibis without requiring the witnesses to testify. McCarthy asserted that he responded, and that [Petitioner] never identified his alibi witness or any alibi. [Petitioner] acknowledged that McCarthy sent him a letter asking for more information about alibi witnesses. McCarthy stated that no possible alibi witness contacted him, including Cummings, and that he would have called back had he received a voice mail message or a message from his secretary. McCarthy opined that an alibi witness who did not come forward until late in the proceedings would have credibility problems and that he would be reluctant to present such a witness to the jury because the witness would not appear to be credible. McCarthy said that he had an investigator appointed from the beginning of November 2015 to

sometime in February 2016, and that he would have utilized this investigator to investigate any identified alibi.

Defense counsel's duty is to prepare, investigate, and present all substantial defenses. *In re Ayres*, 239 Mich. App. 8, 22; 608 N.W.2d 132 (1999). To overcome the presumption of sound trial strategy, the defendant must show that the failure to prepare for trial or interview witnesses resulted in counsel's ignorance of valuable evidence that would have substantially benefited the accused. *People v. Bass*, 223 Mich. App. 241, 252–253; 581 N.W.2d 1 (1997). "Furthermore, the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v. Dixon*, 263 Mich. App. 393, 398; 688 N.W.2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v. Chapo*, 283 Mich. App. 360, 371; 770 N.W.2d 68 (2009) (quotation marks and citation omitted).

Here, had McCarthy known that Cummings would provide alibi testimony, and McCarthy failed to investigate or present the testimony, McCarthy's performance might have deprived [Petitioner] of a substantial alibi defense. However, the evidence indicated that McCarthy was informed generally that [Petitioner] might have had an alibi, and that McCarthy sought more information from [Petitioner]. The trial court found that the performance of [Petitioner's] trial counsel was not deficient because [Petitioner] did not make a good-faith effort to inform McCarthy of his intention to pursue an alibi defense. Ultimately, the evidence indicated that McCarthy was unaware of Cummings because [Petitioner] was unable to specifically identify her, and Cummings did not provide information to McCarthy. Thus, there is no evidence to show that McCarthy did not adequately pursue Cummings's possible alibi testimony.

Even if McCarthy had been aware of the specific alibi testimony, despite [Petitioner's] inability to identify Cummings or provide an address, Cumming's testimony could have been challenged. First, according to [Petitioner], he was discouraged from pursuing her as a witness because she was apparently younger in age, possibly creating additional criminal liability and an adverse reaction from the jury. Also, Cummings could not state the location at which she visited [Petitioner] and testified that they were having sex and selling marijuana while they were babysitting [Petitioner's] child, who was also the child of his girlfriend. This evidence could have adversely impacted Cummings's credibility as well as the jury's opinion of [Petitioner]. Cummings's credibility would also have been questioned because she said she was alone with [Petitioner] until 7:00 p.m., whereas [Petitioner's] girlfriend testified that she came home around 4:00 p.m. and that only [Petitioner] and another person were present. "'[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy,' which we will not second-guess with the benefit of hindsight." *Dixon*, 263 Mich. App. at 398 (quoting *People v. Rockey*, 237 Mich. App. 74, 76; 601 N.W.2d 887 (1999)). Here, there was no record evidence that trial counsel failed to investigate Cummings, that trial counsel failed to make a reasoned

15

decision not to present her as an alibi witness, or that [Petitioner] was denied a substantial defense.

*Dupree*, 2019 WL 6248015, at *2.

The court of appeals concluded that Petitioner's trial counsel was unaware of Cummings because Cummings failed to leave messages on his cell phone and because Petitioner failed to provide Cummings's name to counsel. In his brief supporting his § 2254 petition, Petitioner suggests that the private investigator retained by counsel could have "ask[ed] business people in a particular neighborhood and follow leads to find people when they know of a relevant area to look." (ECF No. 1, PageID.35.) Petitioner's suggestion that counsel could have asked the investigator to locate Cummings when Petitioner failed to provide Cummings's name to counsel is patently absurd. Counsel could only act upon any potential alibi information given by Petitioner and Cummings, and the record reflects that they simply failed to provide information to counsel that would have been sufficient to locate Cummings.

Petitioner has failed to offer any evidence, much less clear and convincing evidence, to overcome the presumption that the court of appeals' conclusion is correct. Thus, Petitioner has failed to show this Court, as he failed to show the court of appeals, that counsel's failure to provide Cummings as an alibi witness rose to the level of deficient performance or that the failure prejudiced Petitioner in any way. In short, Petitioner has not shown that the court of appeals' rejection of this ineffective assistance claim was contrary to, or an unreasonable application of, *Strickland*, and he is not entitled to habeas relief on this claim.

### 3.   Failure to Impeach Matlock

Next, Petitioner faults counsel for failing to "impeach or otherwise present evidence that David Matlock wanted to kill" Petitioner. (Pet., ECF No. 1, PageID.4.) According to Petitioner, Matlock wanted him dead because Petitioner had slept with the mother of Matlock's children.

16

(ECF No. 1, PageID.36–37.) According to Petitioner, asking Matlock if he wanted Petitioner dead was "the one question" that "would have set forth such evidence as to deny the jury . . . from presuming or associating the irregular contacts of alleged criminal partners with such contact as would have been necessary for this defendant to conspire or be involved with anything of benefit to Mr. Matlock and his friends." (*Id.*, PageID.37.)

The court of appeals rejected Petitioner's claim, stating:

[Petitioner] argues that his trial counsel should have attacked Matlock's testimony with information that Watson provided at an investigative subpoena hearing. Watson had claimed that Matlock wanted [Petitioner] dead because they were involved with the same woman, and because Matlock thought that [Petitioner] would implicate him in the crime. At the *Ginther* hearing, [Petitioner] said that Matlock had become angry with him in November 2014 because they were seeing the same woman. McCarthy stated that his defense plan included discrediting the witnesses, like Matlock, who had identified [Petitioner] as being involved, by exposing bias. McCarthy said that he elicited testimony from Watson about [Petitioner's] conflict with Matlock, but not specifically that Matlock wanted to kill [Petitioner], which Matlock could have denied. McCarthy's strategy to discredit Matlock included highlighting lies that he had told, and exposing that it was in his self-interest to testify against [Petitioner]. The trial court found that counsel adequately attacked Matlock's credibility.

At trial, [Petitioner's] trial counsel repeatedly asked Matlock about his self-interested motivation to testify against [Petitioner]. Matlock testified that he was helping himself obtain an agreeable sentence by implicating [Petitioner] and was avoiding possible life sentences for the assault with intent to murder Waller in 2010 and the first-degree murder and conspiracy charges in this case. Matlock had pleaded guilty to the 2010 assault charge and to second-degree murder for the instant case in exchange for a minimum sentence of between 17 to 40 years and his testimony in the instant case. On cross-examination, McCarthy elicited that Matlock had previously lied to the police and in another court to serve his needs. Matlock also testified that he and [Petitioner] had "a big dispute" after Matlock's release from jail, although he could not remember the details. Additionally, during McCarthy's cross-examination of Watson, Watson testified that Matlock was angry with [Petitioner] before Waller's murder because Matlock had discovered that [Petitioner] was involved with Matlock's girlfriend. Watson had additionally testified on direct that [Petitioner] and Matlock had a dispute after Matlock was released from jail about using the assault rifle that [Petitioner] had stolen from his uncle.

Thus, McCarthy's trial strategy to attack Matlock's credibility did not include asking either Matlock or Watson about Matlock's statement about wanting to kill

[Petitioner]. However, McCarthy testified that he was not sure of the response that Matlock would provide, and that asking Watson specifically what Matlock had said may have been calling for inadmissible hearsay. It was reasonable trial strategy to avoid asking a question that Matlock may have denied because he would not have wanted to provide testimony favorable to [Petitioner]. Even without testimony about the extent of Matlock's animosity toward [Petitioner], the jury was informed of the animosity and how it could have motivated Matlock. Most importantly, much of counsel's cross-examination of Matlock focused on providing the jury with information about Matlock's credibility and motive to testify against [Petitioner]. The jury was completely aware of the possible motives for Matlock's testimony against [Petitioner], and McCarthy ensured that the jury would consider this information in making its credibility determination about Matlock.

*Dupree*, 2019 WL 6248015, at *3.

Petitioner has failed to show this Court, as he failed to show the court of appeals, that counsel's failure to further impeach Matlock by asking if he wanted to kill Petitioner rose to the level of deficient performance or that the failure prejudiced Petitioner in any way. Counsel's decisions regarding how to cross-examine and impeach Matlock are matters of trial strategy, which are entitled to "great respect" by this Court. *See Glenn v. Sowders*, No. 85-5754, 1986 WL 18475, at *4 (6th Cir. Dec. 8, 1986); *see also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."). While there may be room for improvement in cross-examination, were that to be "the standard of constitutional effectiveness, few would be the counsel whose performance [pass] muster." *Henderson*, 118 F.3d at 1287 (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)). The issue is not whether counsel's approach was the optimal approach; the issue is not even "whether counsel''s actions were reasonable[,] *Harrington*, 562 U.S. at 105; the issue is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard[,]" *Id*. In the context of the *Strickland* presumption that counsel's conduct falls within the wide range of professional assistance, where the petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial

strategy, Petitioner must show that the challenged action ***cannot*** be considered sound trial strategy. Anything short of that means that "there is [a] reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner has failed to offer any evidence, much less clear and convincing evidence, to overcome the presumption that the court of appeals' conclusion is correct. The record establishes that counsel effectively impeached Matlock by focusing on Matlock's motive to testify against Petitioner and by eliciting the fact that Matlock had previously lied to the police and in another court proceeding. Petitioner merely speculates that asking Matlock if he wanted to kill Petitioner would have completely changed the outcome of his criminal proceedings. As set forth above, however, counsel was able to elicit from Watson during cross-examination that Matlock was angry that Petitioner was involved with Matlock's girlfriend. Any cross-examination of Matlock on the topic would have been cumulative, assuming that Matlock even answered the question truthfully.

The court of appeals identified a strategic reason for counsel's approach regarding impeachment of Matlock. Petitioner's choice to point out a strategy that might have been superior does not suffice. Petitioner has simply failed to show that the court of appeals' identified strategy is unreasonable. Thus, Petitioner has not shown that the court of appeals' rejection of this ineffective assistance claim was contrary to, or an unreasonable application of, *Strickland*, and he is not entitled to habeas relief on this claim.

### 4.     Ballistics/Toolmark Evidence

Finally, Petitioner faults counsel for failing to challenge the admissibility of the toolmark/ballistics evidence under *Daubert*, failing to cross-examine the prosecutor's toolmark/ballistics expert, and failing to hire a defense expert in toolmarks/ballistics. (Pet., ECF No. 1, PageID.4.)

The court of appeals rejected Petitioner's assertions, stating:

[Petitioner] argues that trial counsel was deficient for failing to challenge the ballistics evidence presented by firearms and toolmark expert Detective Sergeant Dean Molnar, or to request an expert to counter Molnar. Molnar testified that the marks on the shell casings indicated that the shell casings collected from Waller's home were fired from the same gun as the shell casings found in the yard of a home in which [Petitioner] had lived. The casings collected at [Petitioner's] former home were collected one year before Waller's murder, after a nearby home had been repeatedly shot at.

[Petitioner] first contends that the ballistics evidence should have been challenged based on questions about the reliability of toolmark evidence. MRE 702 provides for the admission of expert opinion that results from "scientific, technical, or other specialized knowledge," and assists the trier of fact. To determine whether such testimony is admissible, a searching inquiry is mandated. The inquiry is not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from the data. *Gilbert v. DaimlerChrysler Corp*, 470 Mich. 749, 782; 685 N.W.2d 391 (2004). The preliminary determination of the qualification of an expert is an issue for the trial court to decide. *Id.* at 780. The admissibility of expert testimony is in the trial court's discretion. *Unger*, 278 Mich. App. at 216. The trial court must consider many factors to determine "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579, 592–593; 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993). The data underlying the expert's theories and the methodology by which he draws his conclusions, as well as his opinion, must also be reliable. *People v. Yost*, 278 Mich. App. 341, 394; 749 N.W.2d 753 (2008) (quoting *Gilbert*, 470 Mich. at 782).

[Petitioner] cites a Supreme Court order denying leave to appeal in *People v. McAdoo*, 497 Mich. 975; 859 N.W.2d 711 (2015), where in a concurring opinion Justice McCormack concluded that "there are serious questions about whether [toolmark] evidence has an adequate scientific foundation," based on several studies regarding the accuracy of toolmark evidence used for identity. [Petitioner], likewise, cites studies questioning the scientific validity of toolmark evidence in his brief on appeal.

Regarding the ballistic evidence, McCarthy testified that his strategy was to demonstrate that there was no evidence that [Petitioner] was involved with shooting a gun, particularly because [Petitioner] had been evicted from the home where the shell casings were found. The trial court concluded that [Petitioner] had not established that Detective Sergeant Molnar should not have been qualified as an expert or that his methodology was defective. There is no authority establishing that toolmark evidence does not meet the tests for scientific validity necessary to assist the trier of fact as discussed in *Gilbert*, 470 Mich. 749, and *Daubert*, 509 U.S. 579. Thus, it is questionable whether [Petitioner's] trial counsel could have effectively challenged the validity of this evidence. "Failing to advance a meritless

20

argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v. Ericksen*, 288 Mich. App. 192, 201; 793 N.W.2d 120 (2010).

[Petitioner] further argues that his trial counsel should have requested funds to obtain an expert in toolmarks to challenge Detective Sergeant Molnar's testimony. Trial counsel's decision regarding whether to call an expert witness is a matter of trial strategy. *Payne*, 285 Mich. App. at 190. [Petitioner] does not explain how an expert would have contradicted Detective Sergeant Molnar's conclusion that shell casings from two different areas were fired from the same gun, other than to attack the validity of toolmark identifications generally. Again, McCarthy's strategy was to demonstrate that Alexander was the person who shot Waller, and that there was no evidence that [Petitioner] was involved with shooting a gun. The trial court concluded that [Petitioner] had not established that an alternative expert would have testified in his favor, or that challenging Molnar's testimony would have made a difference in the outcome of the trial, and denied [Petitioner's] motion for funds to retain a firearms expert.

Trial counsel presented evidence that [Petitioner] had been evicted, around December 2015, from the home where the casings were found. [Petitioner] has not demonstrated that his trial counsel's strategy to rely on the lack of evidence that defendant used a gun was improper. Additionally, to establish an ineffective assistance claim, it must be demonstrated that it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different." *Jordan*, 275 Mich. App. at 667. Excluding or challenging Molnar's testimony could not have exonerated [Petitioner].

*Dupree*, 2019 WL 6248015, at *4–5.

As noted above, Petitioner first contends that counsel should have requested a *Daubert* hearing to challenge Molnar's testimony. In *Daubert*, the Supreme Court concluded that trial judges must ensure that admitted expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999). "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594. The Court identified several factors for consideration when evaluating scientific expert testimony, including: "the testability of the expert's hypotheses (whether they can be or have been tested, whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 593–94).

21

*Daubert* was concerned with the admissibility of expert testimony pursuant to Federal Rule of Evidence 702. *See Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998) ("*Daubert* concerned the Federal Rules of Evidence which is not relevant to [federal habeas review of] appellant's [state court] conviction."). In Michigan, Rule 702 of the Michigan Rules of Evidence incorporates the standards set forth in *Daubert*. *See Gilbert v. Daimler Chrysler Corp.*, 685 N.W.2d 391, 408 (Mich. 2004).

The court of appeals agreed with the trial court that Molnar was qualified to provide expert testimony under Michigan Rule of Evidence 702. As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry into whether evidence was properly admitted under state law "is no part of a federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 67–68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The appellate court's conclusion that the trial court satisfied the requirements of Michigan Rule of Evidence 702 conclusively resolves that issue. The decision of the state courts on a state-law issue is binding on a federal court. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) (stating "[w]e are . . . bound by the Florida Supreme Court's interpretation of state law. . .."). The

Sixth Circuit repeatedly has recognized "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76); *see also Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018) (same). The court of appeals' determination that Molnar's testimony was admissible pursuant to Michigan Rule of Evidence 702 is, therefore, axiomatically correct on habeas review.

Even an axiomatically correct determination that testimony was admissible under state law does not preclude a determination that the admission of the evidence was so fundamentally unfair that it violated the right to due process. *See, e.g.*, *Randolph v. Wolfenbarger*, No. 04-cv-73475, 2006 WL 1662885, at *5 (E.D. Mich. June 12, 2006) ("The admission of expert testimony in a state trial presents a question of state law which does not warrant federal habeas relief unless the evidence violates due process or some other federal constitutional right.") (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)); *see also Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme

Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

"The Supreme Court has never held that admitting evidence of questionable reliability against a criminal defendant without holding a *Daubert* hearing or similar procedure violates due process." *Bojaj v. Berghuis*, 702 F. App'x 315, 320 (6th Cir. 2017). "The Supreme Court did not set a constitutional floor for the reliability of scientific evidence in *Daubert*, and screening evidence through *Daubert*'s standards is not constitutionally required." *Id.* at 321 (citation omitted); *see also Thomas v. Jackson*, No. 1:17-cv-476, 2017 WL 2608753, at *7 (W.D. Mich. June 16, 2017) ("At no time has the Supreme Court held that *Daubert* and *Kumho Tire* provide the standard for evaluating whether an admission of evidence violates due process."). Petitioner fails to show that the state courts' determinations that Molnar qualified as an expert under Michigan's rules of evidence or that his testimony was reliable violated fundamental fairness.

Because the state court properly admitted Molnar's testimony under Michigan Rule of Evidence 702, and because Petitioner cannot demonstrate that his due process rights were violated by the admission of Molnar's testimony, any request by counsel for a *Daubert* hearing to challenge Molnar's testimony would have been meritless. Even extending beyond Supreme Court authority—which limits this Court's habeas review but not counsel's ability to raise challenges in state court—does not change this conclusion because neither circuit nor district court authority holds that the admission of reliable expert testimony renders a trial fundamentally unfair. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005) ("Because we cannot logically grant the writ based on ineffective assistance of counsel

24

without determining that the state court erred in its interpretation of its own law, we are constrained to uphold the district court's denial of the writ.").

Petitioner also faults counsel for not cross-examining Molnar and for failing to hire a defense expert regarding toolmark and ballistic evidence. However, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* Here, Petitioner fails to explain on what grounds counsel should have cross-examined Molnar, particularly given the fact that counsel's strategy was to demonstrate that there was no evidence that Petitioner was involved with shooting a firearm. Given this focus, counsel's decision to not cross-examine Molnar and to not present a counter-expert was a reasonable trial strategy. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005).

Petitioner, therefore, has not demonstrated that the court of appeals' rejection of his ineffective assistance claim premised upon counsel's failure to pursue a *Daubert* hearing, cross-examine Molnar, and present a counter-expert is contrary to, or an unreasonable application of, *Strickland*. Thus, Petitioner is not entitled to relief for this claim of ineffective assistance.

In sum, Petitioner has not shown that the court of appeals' rejection of any of his ineffective assistance claims was contrary to, or an unreasonable application of, *Strickland*. Thus, Petitioner is not entitled to relief with respect to habeas ground I.

### B.      Grounds II and III—Great Weight and Sufficiency of the Evidence

In his second ground for relief, Petitioner alleges that the jury verdict "went against the great weight of the evidence as there is no direct evidence that [Petitioner] was at the scene when Mr. Waller was murdered and two witnesses who claim he was involved had their testimony heavily impeached." (Pet., ECF No. 1, PageID.7.) As his third ground for relief, Petitioner

contends that the prosecution failed to present sufficient evidence to convict him. (*Id.*, PageID.9.) Plaintiff suggests the fact that he was convicted of second-degree murder leads to a conclusion that there was insufficient evidence to convict of conspiracy to commit first-degree murder. (ECF No. 2, PageID.45.)

As an initial matter, Petitioner's argument regarding the great weight of the evidence, as asserted in habeas ground II, is not cognizable on federal habeas review. Michigan courts apply the great weight of the evidence standard to determine whether or not to grant a new trial. *See People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998). This question is distinct from the due process guarantee offended by insufficient evidence, *see Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007), and "does not implicate issues of a constitutional magnitude." *Id.* at 133 n.8. thus, a "weight of the evidence claim" is purely a matter of state law and is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Wilson*, 562 U.S. at 5 (noting that "it is only noncompliance with federal law that renders a state's criminal judgment susceptible to a collateral attack in the federal courts); *Jerome v. Macauley*, No. 22-2136, 2023 WL 4058595, at *1 (6th Cir. May 22, 2023) (noting that "[a] claim that a petitioner's conviction is against the great weight of the evidence presents an issue of state law that is not cognizable on federal habeas review"). Petitioner, therefore, cannot establish that the state courts' rejection of his great weight of the evidence claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief with respect to habeas ground II.

Petitioner's sufficiency argument, raised in habeas ground III, is cognizable on federal habeas review. In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In resolving Petitioner's sentencing challenge, the Michigan Court of Appeals stated with respect to the standard of review:

> Due process, U.S. Const., Am XIV, requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction. *People v. Hampton*, 407 Mich. 354, 366; 285 N.W.2d 284 (1979), citing *In re Winship*, 397 U.S. 358, 364; 90 S. Ct. 1068; 25 L. Ed. 2d 368 (1970). To determine if the prosecutor produced evidence sufficient to support a conviction, this Court considers "the evidence in the light most favorable to the prosecutor" to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v. Tennyson*, 487 Mich. 730, 735; 790 N.W.2d 354

> (2010) (quoting *People v. Hardiman*, 466 Mich. 417, 429; 646 N.W.2d 158 (2002)). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction. *Id.* In reviewing the sufficiency of the evidence, this Court "is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v. Gonzalez*, 468 Mich. 636, 640–641; 664 N.W.2d 159 (2003) (quoting *People v. Nowack*, 462 Mich. 392, 399–400; 614 N.W.2d 78 (2000)).

*Dupree*, 2019 WL 6248015, at *5. Although the court of appeals primarily cited state court authority for the standard, the standard applied is identical to *Jackson*. Moreover, if one looks to *Hardiman* and the cases cited therein, eventually the source of the standard is identified as *Jackson*. *See People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992). Thus, there is no question that the court of appeals applied the correct standard, eliminating the possibility that the resulting decision is "contrary to" clearly established federal law.

After identifying the standard, the court of appeals applied it and rejected Petitioner's sufficiency arguments in a thorough discussion:

> [Petitioner] contends that the evidence was insufficient to convict him of aiding and abetting second-degree murder, and conspiracy to commit first-degree murder. [Petitioner's] central argument is that he was not identified as being present at the scene of the shooting. "[I]dentity is an element of every offense." *Yost*, 278 Mich. App. at 356.

> However, [Petitioner's] identity in planning and executing Waller's murder was established beyond a reasonable doubt by the testimonies of [Petitioner's] friend, Kierra Hobbs, as well as Matlock and Watson. The reason for killing Waller was that Matlock had shot him in 2010 and Waller could have implicated Matlock in that shooting. Matlock and Watson testified about how Matlock had repeatedly asked Alexander and Watson to "take care of," or kill Waller; Matlock could not do so because he was being held on a warrant for the 2010 shooting. Alexander and Watson agreed to help Matlock by killing Waller. [Petitioner] told Hobbs that he was asked to kill someone after she heard him discuss the issue on the phone. Hobbs then witnessed [Petitioner] planning with Alexander and Shawn Pearson to lure someone from their home in order to kill them by promising to pay rent. Watson's former testimony was similar to Hobbs's testimony that [Petitioner] had planned the murder with him at [Petitioner's] home, and then distributed the weapons. Officer LeDawn Russell, the next-door neighbor, noted that Waller was a landlord.

Hobbs also witnessed [Petitioner] leave in his brown Buick with two other men and guns on the day that Waller was murdered. Witnesses saw a gold or light-brown car initiate contact with Waller in his driveway, and Waller was murdered consistent with the plan that [Petitioner] put forth with his associates in front of Hobbs. [Petitioner] celebrated news reports of Waller's killing, boasted to Hobbs about the killing, and showed her blood from the killing in his brown Buick. [Petitioner's] girlfriend, Anarika Dafney, testified that [Petitioner] had access to a tan or gold Buick at the time, and [Petitioner] had been stopped by police while driving a gold or tan sedan Buick three times, on November 4, 2014, November 25, 2014, and January 28, 2015. Dafney and a neighbor testified that Dafney sold a gold Buick to the neighbor for $200 near the time that [Petitioner] was incarcerated for this crime.

At a January 5, 2015 gathering, Alexander was heard describing being in a gold Buick when he participated in killing Waller in a way that was consistent with [Petitioner's] plan as reported by Hobbs. According to Matlock, at the gathering, [Petitioner] boasted of participating in Waller's killing, including how he lured Waller to the shooting. Watson's recanted testimony was consistent with other testimony establishing that [Petitioner] was the driver, and that Matlock thanked him at the gathering.

[Petitioner] argues that the testimony of Matlock and Hobbs was not credible because of the favorable plea deals they made in exchange for their testimony, as well as Hobbs' use of drugs. However, the jury heard all of this evidence and was tasked with determining the credibility of the witnesses. An appellate court "does not interfere" with the fact-finder's "assessment of the weight and credibility of witnesses or the evidence[.]" *People v. Dunigan*, 299 Mich. App. 579, 582; 831 N.W.2d 243 (2013). The trier of fact determines "what inferences may be fairly drawn from the evidence" and "the weight to be accorded those inferences." *People v. Henderson*, 306 Mich. App. 1, 9; 854 N.W.2d 234 (2014) (quoting *Hardiman*, 466 Mich. at 428). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Gonzalez*, 468 Mich. at 640–641 (quoting *Nowack*, 462 Mich. at 399–400). Based on these credibility determinations and the evidence, a rational juror could have found beyond a reasonable doubt that [Petitioner] planned and participated in Waller's murder.

[Petitioner] further argues that the evidence of conspiracy to commit first-degree murder was insufficient because the jury found that he was guilty of second-degree murder, which did not involve the premeditation element required for first-degree murder. *See People v. Bennett*, 290 Mich. App. 465, 472; 802 N.W.2d 627 (2010). [Petitioner] argues that, if the second-degree murder of Waller was unplanned, then [Petitioner] could not be guilty of having planned it. It is possible that the jury found that [Petitioner] agreed with at least Alexander to accomplish the premeditated killing of Waller by luring him out to the car, but that the jury concluded [Petitioner] was an accomplice to Alexander and one other person's intentional killing of Waller that was done without premeditation, but with malice, when the assailants

chased Waller into his home. Nonetheless, the evidence was sufficient to demonstrate that [Petitioner] agreed to participate in the premeditated killing of Waller, and that he did participate in Waller's murder by driving the car and attempting to lure him outside. Notably, while independently considering two separate offenses, a jury in a criminal case may reach different conclusions concerning the identical element contained in both offenses. *People v. Goss*, 446 Mich. 587, 597; 521 N.W.2d 312 (1994). A jury may reach inconsistent verdicts as a result of mistake, compromise, or leniency. *Id.* at 597–598. The jury can choose, without any apparent logical basis, what to believe and what to disbelieve because the jury is the sole judge of all the facts. *People v. Vaughn*, 409 Mich. 463, 466; 295 N.W.2d 354 (1980). The verdicts are not inconsistent where there is an interpretation of the evidence that provides a logical explanation for the findings of the jury. *People v. Tombs*, 472 Mich. 446, 462–463; 697 N.W.2d 494 (2005).

. . .

[Petitioner] noted the lack of physical evidence and eyewitness testimony of [Petitioner's] involvement, even though both Officer Russell, from next door, and Lawrence Harris witnessed the gold Buick in Waller's driveway. Both described the driver, distinctly, and did not identify [Petitioner]. However, it was not discussed how clearly the witnesses saw the driver of the vehicle from inside their homes, particularly considering that they had to quickly seek safety from the gunshots. Importantly, neither witness stated that [Petitioner] did *not* appear to be the driver of the vehicle, in contrast to the testimonial evidence identifying [Petitioner] as the driver of the vehicle. Further, there was no physical evidence to contradict the testimonial evidence that [Petitioner] was involved in the planning and execution of Waller's death.

[Petitioner] notes that there were other vehicles similar to the one used in the murder in the area because the police had impounded a vehicle reported by Officer Russell and found that it was not the vehicle used in the crime. However, a tan or gold Buick was used in the crime, and [Petitioner] had access to and was cited while driving the same type of vehicle in the months preceding and following the crime. That the police did not recover the vehicle does not contradict the fact that [Petitioner] drove the vehicle as a part of the crime.

[Petitioner] also argues that the ballistics evidence, indicating that the shell casings at the murder scene were fired from the same gun as the shell casings found in the backyard of [Petitioner's] former home, do not provide a link between [Petitioner] and the murder. Because it was not demonstrated, or alleged, that [Petitioner] fired the weapon at either location, it is true that this evidence could not demonstrate that [Petitioner] shot Waller. The jury was empowered to weigh the evidentiary value that the gun used to kill Waller had also been fired on [Petitioner's] property. Notably, this evidence does not exclude the possibility that [Petitioner] participated in planning and executing the murder.

30

Finally, [Petitioner] argues that the credibility issues of Matlock, Hobbs, and Watson should have prevented the jury from determining that [Petitioner] was guilty. Matlock and Hobbs testified pursuant to plea deals in order to achieve more favorable sentences, and [Petitioner's] trial counsel elicited testimony that Hobbs had abused drugs and that Matlock had opportunistically lied. [Petitioner] asserts that Watson's previous testimony could not be trusted because he recanted, and notes that the prosecutor did not charge another individual whom Watson had implicated. However, the jury heard the entirety of the testimony and was responsible for making credibility determinations. "In general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Lemmon*, 456 Mich. at 643. Unless there are "exceptional circumstances," the jury determines the credibility of witnesses and the reviewing court may not substitute its view on credibility, an issue that the constitution guarantees is in the province of the jury. *Id.* at 642. Even where the "testimony is in direct conflict and testimony supporting the verdict has been impeached," because the jury determined credibility, "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it." *Id.* at 643. "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Lacalamita*, 286 Mich. App. at 469-470 (quoting *Lemmon*, 456 Mich. at 647). Thus, the verdict was not against the great weight of the evidence and [Petitioner] has not demonstrated plain error.

*Dupree*, 2019 WL 6248015, at *5–7.

Petitioner does not directly challenge the court of appeals' thorough review of the evidence or the reasonable inferences to be drawn from that evidence. "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Petitioner can overcome that presumption with clear and convincing evidence; he has not. He does not offer any evidence to show that the court of appeals' factual determinations are unreasonable on the record.

Similarly, Petitioner fails to demonstrate that the inferences identified by the court of appeals are unreasonable. *Jackson* holds that it is the fact-finder's province to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id.* at 655. The *Coleman* Court described a

31

reasonable inference as an inference that a rational factfinder could make from the facts. The inferences identified by the court of appeals rationally flow from the underlying facts. The inferences are not compelled by those facts. The inferences may not even be more likely than not; they are simply rational. *Id*. at 656. Nothing more is required.

Rather, in his brief supporting his § 2254 petition, Petitioner reiterates his argument that there was insufficient evidence to convict him of conspiracy to commit first-degree murder because the jury found him guilty of second-degree murder. (ECF No. 2, PageID.45.) Petitioner contends that these inconsistent verdicts cannot stand. (*Id.*) Petitioner, however, cannot seek federal habeas relief based upon his disagreement with the court of appeals' determination that both verdicts could stand under state law. *See Pulley*, 465 U.S. at 41 (noting that "[a] federal court may not issue a writ on the basis of a perceived error of state law"). Moreover, "inconsistent verdicts do not present a constitutional problem." *Tackett v. Trierweiler*, 956 F.3d 358, 372 (6th Cir. 2020) (citing *Harris v. Rivera*, 454 U.S. 339 (1981)); *see also United States v. Powell*, 469 U.S. 57, 67 (1984) (noting that review for sufficiency of the evidence should not be "confused with the problems caused by inconsistent verdicts" and "should be independent of the jury's determination that evidence on another count was insufficient"). Petitioner, therefore, cannot demonstrate that the court of appeals' conclusion rejecting his inconsistent verdict claim is contrary to, or an unreasonable application of, clearly established federal law.

Petitioner also asserts that there was insufficient evidence to support his convictions because the testimony provided by Hobbs and Matlock was impeached and, therefore, should not have been considered to be credible. (ECF No. 2, PageID.45.) Petitioner, therefore, invites this Court to reweigh the credibility of these witnesses and resolve all conflicts and make all inferences in his favor. However, it is up to the jury to decide issues of credibility, to decide between

conflicting accounts, and draw inferences— so long as the inferences are rational. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head. Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdict is contrary to, or unreasonable applications of, clearly established federal law. Accordingly, he is not entitled to relief on habeas ground III.

### C.  Ground IV—Sentencing Error

As his last ground for relief, Petitioner contends that the trial court erred "when it indic[a]ted in the judgment of sentence that [Petitioner's] conspiracy to commit first degree murder conviction sentence was life without parole." (Pet., ECF No. 1, PageID.11.) Petitioner contends that at sentencing, the trial judge orally stated that she was sentencing Petitioner to "life with the possibility of parole." (*Id.*) Petitioner suggests that the life without parole sentence is "excessive, invalid[,] and against the law of Michigan." (ECF No. 2, PageID.49.) He also vaguely refers to the Eighth Amendment, possibly suggesting that his sentence violates that amendment's cruel and unusual punishment clause. (*Id.*, PageID.51.)

The court of appeals rejected Petitioner's claim, stating:

The trial court sentenced [Petitioner] for conspiracy to commit first-degree murder by stating, "[P]ursuant to the statute I'm going to sentence you to life with the possibility of parole." However, the judgment of sentence provides that [Petitioner] was sentenced to life *without* the possibility of parole for this conviction. The conspiracy statute, MCL 750.157a(a), provides, in relevant part:

[I]f commission of the offense prohibited by law is punishable by imprisonment for 1 year or more, the person convicted under this section shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit.

Thus, the trial court was required to sentence [Petitioner] to the sentence prescribed by the first-degree murder statute. MCL 750.316 provides that a defendant who commits a premeditated killing "is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole." Thus, the trial court was required to sentence [Petitioner] to life *without* the possibility of parole, and the judgment of sentence is legally correct.

33

[Petitioner] cites *People v. Jahner*, 433 Mich. 490, 504; 446 N.W.2d 151 (1989), where the Court analyzed the conspiracy, first-degree murder, and "lifer" statues, and concluded that "a person sentenced to life imprisonment for conspiracy to commit first-degree murder is eligible for parole consideration[.]" However, the first-degree murder statute, MCL 750.316, was amended in 2014 and now includes the requirement that those convicted of first-degree murder "shall be punished by imprisonment for life without eligibility for parole." Thus, *Jahner* did not consider a first-degree murder statute that included the life without parole language. Where a judgment of sentence does not include a statutorily mandated punishment, the sentence is invalid. *People v. Comer*, 500 Mich. 278, 292; 901 N.W.2d 553 (2017). Had the trial court sentenced [Petitioner] to life with the possibility of parole, the sentence would have been invalid and subject to correction pursuant to the previous version of MCR 6.429. Thus, the trial court did not plainly err by issuing the judgment of sentence.

*Dupree*, 2019 WL 6248015, at *8 (footnote omitted).

As noted above, "a federal court may issue the writ to a state prisoner 'only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson*, 562 U.S. at 5 (quoting 28 U.S.C. § 2254(a)). In support of his claim, Petitioner references only state law—the Michigan Constitution and various state statutes. (Pet., ECF No. 1, PageID.11–13.) Thus, Petitioner's claim that the state courts violated state sentencing principles is purely a state law claim that is not cognizable on habeas review. *See Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000) (concluding that alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

To the extent that Petitioner asserts that his sentence violates the Eighth Amendment's proscription against cruel and unusual punishment, the United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (discussing that gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S.

34

11, 36 (2003) (holding that principle applies only in "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality" (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980))). A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin*, 213 F.3d at 302 (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)). Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

As noted above, Petitioner was sentenced to life in prison without the possibility of parole. To the extent proportionality is required, when conducting a proportionality analysis under the Eighth Amendment, courts "look to the gravity of the offense and the harshness of the penalty." *Solem v. Helm*, 463 U.S. 277, 290–91 (1983). Here, the Court cannot conclude that Petitioner's sentence runs afoul of the Eighth Amendment. Notably, in *Harmelin*, the Supreme Court upheld Michigan's law imposing a sentence of life without parole for possession of more than 650 grams of cocaine. *See Harmelin*, 501 U.S. at 959–60. Here, Petitioner was convicted of, *inter alia*, conspiracy to commit first-degree murder, and the evidence presented at trial established that Petitioner entered into an agreement with others to murder Waller because of Matlock's fear that he would be incarcerated for life if Waller testified against him. The Court concludes that the offense is at least as grave as the drug possession offense at issue in *Harmelin*. Therefore, it does not appear that the mandatory life without parole sentence is disproportionate in a constitutional sense. *See, e.g.*, *United States v. Dorman*, 108 F. App'x 228, 250 (6th Cir. 2004) ("The thrust of Dorman's argument is that he is being punished with disproportionate severity given that he did not take part in either of the murders. However, he was convicted of conspiracy to commit murder

35

for hire and the jury was instructed to convict only if it found that he knew of the object of the conspiracy and helped to advance it. We detect no error in the imposition of a life sentence."); *United States v. Gonzalez,* 905 F.3d 165, 208 (3rd Cir. 2018) ("In sentencing Gonzales to life imprisonment, the District Court noted that she played an instrumental role in the conspiracy against Belford, whose death was a reasonably foreseeable consequence of the conspiracy. Thus, her life sentence does not violate the Eighth Amendment."); *United States v. Hernandez*, 388 F.3d 1199, 1258 (9th Cir. 2004) ("Fernandez's RICO convictions were predicated on the jury's finding that he had committed the crime of conspiracy to commit murder, a crime at least as grave as the drug possession at issue in *Harmelin*. Moreover, the defendant in *Harmelin* was a first-time offender, whereas Fernandez has a long history of serious criminal conduct. . . . Given the gravity of Fernandez's crimes and his criminal history, his Eighth Amendment claim is meritless.") Certainly, Petitioner has not demonstrated that the state courts' determinations regarding his sentence are contrary to, or unreasonable applications of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground IV.

**VI. Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under

*Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:   <u>September 20, 2023</u>                          <u>/s/ Robert J. Jonker</u>
                                                          Robert J. Jonker
                                                          United States District Judge

37